**MORELAND et al. v. KNOX.**

No. 10219.

Court of Civil Appeals of Texas.

Austin.

May 12, 1954.

Rehearing Denied June 9, 1954.

Sneed & Vine, Tom Long, Black & Stayton, Austin, for appellants.

Byron Lockhart, Renne Allred, Jr., Austin, for appellee.

ARCHER, Chief Justice.

· This is an appeal by certain policyholders of Texas Mutual Insurance Company, hereinafter called Texas Mutual, from an order of the Fifty-Third Judicial District Court of Travis ·County, Texas, levying an assessment equivalent to one annual premium against every policyholder of Texas Mutual who had a policy in force during the period from February 14, 1952, to February 13, 1953, inclusive.

The appeal is based on nine points assigned as error by the trial court, and are to the effect that the Board's finding that Texas Mutual had the surplus required of a company issuing nonassessable policies, and the approval of the issuance of such were conclusive of the company's authority to do so, irrespective of whether in actual fact the surplus existed, that in any event purchasers of nonassessable policies may not be assessed if the policies were issued prior to the time Texas Mutual, a Court, the Board or some other regulatory body determined that the surplus required by V.A. T.S. Insurance Code, Article 15.11 did not exist, that if the Liquidator had the right to set aside the Board's erroneous finding that Texas Mutual had such surplus, appellants have the right to set aside the finding of the Board that Texas Mutual had the cash surplus required and its erroneous action in issuing to such company a certificate to engage in business renders void, as between appellants and the company, the policies issued appellants, and prohibits any assessment against appellants, that since Texas Mutual represented that the policies purchased by appellants were nonassessable the company is estopped to levy an assessment and likewise the Liquidator, that no assessment may be levied for the purpose of paying claims that arose prior to the time appellants became policyholders, that if Article 15.11 be interpreted as authorizing such a decree then such article is unreasonable, and violates the Constitution of both the State of Texas and the United States, that it was error to assess policyholders whose policies were in force at any time during the period from February 14, 1952, to February 13, 1953, inclusive, because Article 15.11 provides that "no member shall be liable for any part of such contingent premium in excess of the amount demanded within one year after the termination of the policy", and because no demand has been or will be made upon many of the

policyholders within such period, and finally in decreeing an assessment against one group of policyholders for the purpose of paying claims of another group of policyholders, irrespective of the position of third party creditors, and as between themselves may defend any claim for assessment upon the ground of fraud.

Texas Mutual was organized May 17, 1949, and authorized to receive applications for insurance, etc., but not to issue policies, and given six months in which to comply with Chapter 9, Title 78, R.C.S., Texas,* and on July 6, 1949, applied for a certificate of authority to engage in the insurance business, and submitted an affidavit by Paul Lowry and Leslie Lowry reciting that the company had on deposit in a named bank in Beaumont the amount of $20,000 in cash subject to its disposal, and that no one had any interest or claim thereto, and that the company was not indebted to the bank. There was attached to the affidavit the affidavit of the cashier of the bank that the company had on deposit the sum of $20,000.

The Board of Insurance Commissioners on July 11, 1949, issued its certificate that

"This Is To Certify That
  Texas Mutual Insurance Company
        Beaumont, Texas
has, according to sworn statement, complied with all requirements of law applicable thereto and is hereby authorized to pursue the business of
    Fire; Lightning; Explosion; Extended Coverage; Windstorm; Tornado; Hail; Auto—Fire, Theft, Collision and Comprehensive
insurance within this State for year ending May 31, 1950, in accordance with provisions of Chapter 9, Title 78, R.C.S., Texas, 1925.
        In Witness Whereof, I hereunto sign my name and affix my official seal at Austin, Texas, this 11th day of July, 1949.
            s/ George B. Butler
            Chairman of Board"

The official minutes of the Board dated July 11, 1949, reads as follows:
            "Official Minute
                of Meeting
    Board of Insurance Commissioners
            Austin, Texas
        Date   July 11, 1949
Members present:              Voted
  George B. Butler             ____
  Life Insurance Commissioner,
                    Chairman
  Paul H. Brown                ____
  Fire Insurance Commissioner
  J. P. Gibbs        .         ____
  Casualty Insurance
    Commissioner
Subject Considered:
  Qualification of a Chapter 9
    Company
General remarks and action taken:
  "The Texas Mutual Insurance Company, Beaumont, Texas, was granted a temporary permit in accordance with the provisions of Chapter 9, Title 78, R.C.S., Texas, 1925.
  "The company has furnished this Department with sufficient evidence to entitle it to receive a certificate of authority to transact the business of a mutual fire insurance company in this State, and it is ordered, therefore, that such license be issued to the above company for the year ending May 31, 1950.
  "The above application for license has been approved by L. W. Blanchard, Chief Examiner.
        "s/  George B. Butler
            "George B. Butler, Chairman
        "s/  Paul H. Brown
            "Paul H. Brown, Fire
            Insurance Commissioner
        "s/  J. P. Gibbs
            "J. P. Gibbs, Casualty
            Insurance Commissioner."

The affidavit appears to have been untrue, and that the $20,000 had been borrowed from an individual on July 9, 1949, and a note payable on demand executed.

* Now V.A.T.S. Insurance Code, art. 15.01 et seq.

The entire amount of $20,000 was withdrawn on July 16, 1949, and never replaced as a cash surplus.

On August 5, 1949, David E. O'Fiel and Emmett E. Langham, for a recited consideration of $10 in cash and other good and valuable considerations, conveyed to the Texas Mutual certain real property in Beaumont, Texas. On August 5, 1949, Texas Mutual executed an instrument in the nature of a deed of trust to secure the payment of an outstanding note secured by a lien on the property herein involved in the sum of $40,023.10 and also to secure the payment of a note payable to David E. O'Fiel et al. in the principal amount of $59,976.90.

On the 8th day of August, 1949, Texas Mutual Insurance Company acknowledged that Paul R. Lowry and Leslie D. Lowry had jointly advanced to the company the sum of $336,000 to enable the company to comply with any requirement of the law, and to be repayable, after providing for all reserves, etc. It was stated that at all times the company should maintain a free policyholders' reserve of $200,000 in addition to all other reserves, etc.

An appraisal of the property made by three persons fixed the overall value of the property at $436,000, which together with the certificate of advance, were submitted in support of the company's request for authority to write nonassessable policies.

On August 18, 1949, the Chief Examiner for the Board wrote Texas Mutual that the appraisals of the property being deeded to it and the certificate of advance by the Lowry Brothers were acceptable to the Department.

The property was conveyed to the company direct and the Lowry Brothers never had title. The only consideration was the assumption of an outstanding indebtedness and the execution of the note above mentioned.

There is testimony that the property was in no case worth over $100,000.

On November 7, 1949, the following letter was written:

"State of Texas
Board of Insurance Commissioners
Life Division
Austin
November 7, 1949
Mr. Paul R. Lowry, President
Texas Mutual Insurance Company
920 Pearl Street
Beaumont, Texas

Dear Sir:

This will acknowledge receipt of a statement of the Texas Mutual Insurance Company made as of October 31, 1949 showing Surplus to Policyholders in the amount of $363,526.76 and a letter from Mr. H. W. Gardner, Vice President of the First National Bank of Beaumont, Texas under date of November 4, 1949, which certifies that the Texas Mutual Insurance Company had on deposit in that Bank as of October 31, 1949 the sum of $36,595.97. We are returning herewith the original of this statement and letter together with a copy of each and we are retaining for our files the other copy sent by you.

The writer personally examined the deed in which you and your brother conveyed to the Texas Mutual Insurance Company real estate for home office property together with the appraisal made by Beaumont real estate men on this property, and this Department has accepted the home office property at a valuation of $436,000.00 less the outstanding incumbrance, originally at $100,000.00, as a fair and reasonable valuation on the property for your company.

We hope this is the information you desire.

Yours very truly,
George B. Butler, Chairman
Board of Insurance Commissioners
(Signed) By L. W. Blanchard
L. W. Blanchard, Chief Examiner"

The Board issued its certificates of authority covering several periods of time, certifying that the company " * * * has according to sworn statement, complied with all requirements of law * * *" the last of which is dated April 30, 1952, and covers a period ending May 31, 1953.

On April 30, 1952, the Board entered its order as follows:

"Official Minute
of Meeting
Board of Insurance Commissioners
Austin, Texas
Date April 30, 1952

Members present: Voted
  George B. Butler ———
  Life Insurance Commissioner,
    Chairman
  Paul H. Brown ———
  Fire Insurance Commissioner
  Garland A. Smith ———
  Casualty Insurance Commissioner

Subject Considered:
Renewal Certificate of Authority
General remarks and action taken:
"The annual reports of the attached list of companies have been duly examined and approved by R. R. Butler, Supervising Examiner, as complying with the law, and the companies have done and performed all things necessary under the law to entitle them to be licensed in this State for the year ending May 31, 1953, and it is ordered, therefore, that such licenses be issued to the said companies.

  "s/ George B. Butler
    "George B. Butler, Chairman
    "Paul H. Brown, Fire Insurance
      Commissioner
  "s/ Garland A. Smith
    "Garland A. Smith, Casualty
      Insurance Commissioner

Included in list attached is Texas Mutual Insurance Company.

The policies contained on their face the following provisions:

"Mutuals—Participation Clause Without Contingent Liability

"No Contingent Liability: No policyholder in this company incurs any liability other than the Deposit Premium or Premium Paid; the company having accumulated, and now having intact, a a free surplus equal to the Capital Stock required of a domestic stock insurance company transacting the same kind of insurance. This is in accordance with the company's By-Laws and the provisions of the Mutual Insurance Act passed by the 41st Legislature, 1929, First Called Session, Page 90, Chapter 40, Section 10.

"Mutual Participation: The insured is, by virtue of this policy a member of the company, subject to the By-Laws, reference to which is had, and shall be entitled to such unabsorbed Deposit Premium or Dividend as may be declared by the Board of Directors of Executive Committee, subject, however, to approval by the Board of Insurance Commissioners of the State of Texas before being paid."

The policy forms had the following endorsement:

"No. AG 1220
Texas Mutual
Insurance Company
A Mutual Company
This Policy is Nonassessable
Mutual Policy Conditions

"This policy is issued by a Mutual Company having special regulations lawfully applicable to its organization, membership, policies or contracts of insurance, of which the following shall apply to and form a part of this policy:

"This policy is nonassessable. The policyholder is a member of the company and shall participate, to the extent and upon the conditions fixed and determined by the Board of Directors of the Company in accordance with the provisions of law, in the distribution of dividends so fixed and determined."

The policies were on forms prescribed by the Commission as to terms, conditions, restrictions and liability, and required the company to file specimen copies of such policies.

On May 25, 1950, Commissioner Gibbs wrote the following letter:

"Mr. Travis White
City Attorney
El Paso, Texas
Dear Mr. White:

Texas Mutual Insurance Company—Beaumont, Texas

I am sorry that it was not possible for me to give the information you requested by wire.

In checking the Company's annual statement for the year ending December 31, 1949, we find that they have total admitted assets of $465,356.42 with total liabilities, except capital, of $99,036.42, leaving a surplus as regards policyholders of $366,320.04.

The Company having submitted evidence to this Department that it has a free surplus in excess of $200,000.-00 is, therefore, entitled to write a non-assessable policy as provided by Article 4860a–10 and the policy on file with this Department does carry the non-assessable provision.

The Company has met the requirements as set out in the law and is licensed to write all forms of automobile coverage.

I trust that this gives you the desired information.

Very truly yours,
J. P. Gibbs, Commissioner
Casualty Actuary"

On September 23, 1949, Mr. L. W. Blanchard, Chief Examiner, wrote the following letter:

"To:     Mr. Rustin, Fire Insurance Department
Mr. McDonald, Casualty Insurance Department
Date:    September 23, 1949
From:    L. W. Blanchard, Chief Examiner

"The Texas Mutual Insurance Company, 950 Pearl Street, Beaumont, Texas, organized recently under the provisions of Chapter 9, Title 78, Revised Civil Statutes of Texas, as a mutual legal reserve fire and casualty insurance company, has submitted evidence to this Department that it has a free surplus in excess of $200,000.00, and is therefore entitled to write a non-assessable policy. If you find these policies to be acceptable, please file mark one of each type and send to the Company, retaining one in your files.

"s/  L. W. Blanchard
"L. W. Blanchard,
Chief Examiner"

The company filed its annual statements for the years 1949, 1950 and 1951, showing that it was writing nonassessable policies. These statements were approved by the Board in words as follows on April 4, 1950:

"Official Minute
of Meeting
Board of Insurance Commissioners
Austin, Texas
Date   April 4, 1950

Members present:              Voted
George B. Butler              ———
Life Insurance Commissioner,
Chairman

Fire Insurance Commissioner    ———
J. P. Gibbs                    ———
Casualty Insurance
Commissioner

Subject Considered:
Renewal Certificates of Authority
General remarks and action taken:
The annual reports of the following companies have been duly examined and approved by M. E. Martindale, Actuary to the Board and R. R. Butler, Supervising Examiner, as complying with the law, and the companies have done and performed all things necessary under the law to entitle them to be licensed in this State for the year ending May 31, 1951, and it is ordered, therefore, that such licenses be issued to the following companies: * * *."

Included in the list is Texas Mutual Insurance Company.

A similar order was made on March 8, 1951, and on April 30, 1952.

The contentions of appellants are that the Board's findings and orders with respect to the authority of Texas Mutual to issue nonassessable policies were and are conclusive.

The appellee takes the position that the Board of Insurance Commissioners never made a determination that the company had a $200,000 reserve, nor did it approve the action of the company in issuing such policies.

The Insurance Code, V.A.T.S., is long and we shall not copy any more if its articles than appear essential to an understanding of this case.

Art. 1.04 prescribes the duties of the commissioners, providing for individual supervision of phases of insurance, but that the Board shall operate as a whole.

The powers and duties of the Board are set out in Art. 1.10 and provide for the execution of all laws, file articles of incorporation, calculate reserve, control of a company when its capital is impaired, publish reports of investigation, suspend or revoke certificates, report to the Attorney General and the Governor, and other States, etc.

Art. 1.11 provides for annual statements.

Art. 1.14 provides for the issuance of certificates of authority; and Art. 1.15 provides for an examination of each company under the direction of the Chairman of the Board by examiners commissioned by him, and that the Chairman may revoke or modify any certificate of authority issued by him, etc.

Expenses of examination are to be paid by the corporations examined as set out in Art. 1.16.

Art. 1.17 authorizes the Chairman of the Board to appoint examiners, one of whom shall be the Chief Examiner, all of whom shall be under the direction of the Chairman.

Art. 1.19 authorizes the Chairman of the Board to require free access to all books and records for purposes of examination.

Art. 5.06 provides that the Board shall prescribe policy forms, and that no other form shall be used, except it be approved by the Board, etc.

Arts. 5.35 and 5.36 provide that the Board shall make and establish uniform policies and that same shall be used, and that all endorsements placed upon insurance policies shall be subject to the approval of the Board, etc.

Art. 15.11 is as follows:

"The policies shall provide for a premium or premium deposit payable in cash, and except as herein provided for a contingent premium at least equal to the premium or premium deposit. Such a mutual company may issue a policy without a contingent premium while, but only while, it has a surplus equal to the capital required of a domestic stock insurance company transacting the same kinds of insurance, but any such company may issue a policy providing that the holder of any such policy shall be liable for no greater amount than the premium or premium deposit expressed in the policy. If at any time the admitted assets are less than the unearned premium reserve, other liabilities and the required surplus, the company shall immediately collect upon policies with a contingent premium a sufficient proportionate part thereof to restore such assets, provided no member shall be liable for any part of such contingent premium in excess of the amount demanded within one year after the termination of the policy. The Board may, by written order, direct that proceedings to restore such assets be deferred during the time fixed in such order."

It was the duty of the Chairman of the Board and the Board as a whole to have determined that Texas Mutual had

complied with all requirements of the law as a fact before the certificates of authority were issued under the provisions of Sec. 1, Art. 1.14.

■ We believe that the Chairman of the Board of Insurance Commissioners as well as the Board have determined that the alleged surplus existed and that the purchasers of nonassessable policies were justified in relying on the provisions of the policies and on the several certificates of authority issued, as well as the examiner's report, and the several reports made by the Board as hereinabove referred to.

Each policyholder was induced to become such by reason of the representation that his policy would be nonassessable, and actually the minds of such policyholders and the agent of the company never met upon a contract under which the policyholders might be assessed.

■ It was the duty of the Chairman of the Board and the Board to have the company examined at such intervals as would enable a determination that the surplus actually did or did not exist.

We recognize that the organization of the company, its surpluses and its operation is clothed in questionable procedure, and that in all actual probability the company never had the free surpluses as it claimed and as it reported to the Board.

The certificate of advance and apprai- sal were submitted in support of the com- pany's request to issue nonassessable poli- cies.

The record in the case is long and con- sists of many exhibits, some pertaining to the organization, some to the certificates and others as to annual reports, and the Board's action thereon, together with the several reports made by the Board to the Governor and other agencies.

The testimony is that of a number of witnesses, some of whom are employees of the Commission, some of the company, as well as other individuals. As a whole the record is made up of five volumes. The oral evidence comprises over seven hun- dred pages, and is related to the organiza- tion, operation and conduct of the Mutual's business and of its affairs and we see no need to embody herein such testimony.

We have been favored with excellent briefs and the questions are well presented.

■ As we have stated we believe that under the Insurance Code as administered by the Chairman of the Board and the ex- aminers with the approval of the Board either by its certificates and orders or at any rate by its implied approval that the policies, carrying as they did the nonas- sessable clause, that the policyholders are not subject to an assessment. Kavanaugh v. Underwriters Life Insurance Co., Tex. Civ.App., 231 S.W.2d 753, error ref.

In making this decision we are not un- aware of the just claims of the third party claimants or creditors as such, and that they should be paid as a matter of moral right, but it was the duty of the Chairman of the Board, with the aid and advice of his examiners, and the Board as such to have more carefully examined and deter- mined the true condition of the company at its organization and at all times during its operation, and having apparently failed to do so the policyholders are not liable for an assessment. Manhattan Life In- surance Co. v. Wilson Motor Co., Tex.Civ. App., 75 S.W.2d 721, error ref.

In Dwinnell v. Kramer, 87 Minn. 392, 92 N.W. 227, it was held that a policyhold- er is liable to assessment in accordance with his contract, and that the conditions must be stated in full. The opinion is long and we refer to it for a full recitation of the holding. Patrons' Mutual Fire Insur- ance Co. v. Brinker, 236 Mich. 367, 210 N.W. 329.

In Gilley v. Missouri State Life Insur- ance Company, 116 Tex. 43, 285 S.W. 807, 808, the Court stated that the purpose of the Department of Insurance is of enforc- ing the insurance laws:

"The department of insurance is or- ganized for the very purpose of en-

forcing the insurance laws. It has no reason for existence, except to enforce the insurance laws. In doing this many duties are prescribed, but the basis of all of them is to see that the statutes of the state enacted for the protection of the people are complied with by insurance companies. It would be idle to say that under those statutes it is not the duty of the insurance commissioner to see that insurance companies issue only policies authorized and permitted by the law."

In Denton v. Ware, Tex.Civ.App., 228 S.W.2d 867, at page 871, the Court held:

"* * * as a prerequisite to the right to engage in the insurance business * * * the statutes requiring charters and permits must be complied with, but those statutes are for the protection of the citizens of the state who may deal with such companies." Boucher v. Wallis, Tex.Civ.App., 236 S.W.2d 519, error ref., n.r.e.

In view of our holding that the policies are nonassessable it is not necessary for us to pass on the other points.

The judgment of the trial court insofar as it fixed liability on appellants is reversed and rendered in favor of appellants.

Reversed and rendered.

HUGHES, Justice (concurring).

The record in this case is replete with evidence of fraudulent and corrupt abuse of our insurance laws and gross if not criminal laxity in their enforcement. Yet, so far as the record reflects, no effort has been made to bring to account those responsible. In fact the principal transgressor, Paul Lowry of Beaumont, Texas, boasted as late as June 1953 that "he was still free to walk around the streets." There is, however, a determined attempt, as shown by the relief sought in this case, on the part of the insurance department, through its statutory liquidator-receiver[1] to mulct victimized and innocent policyholders. I am in full agreement with the Court's opinion which repulses this attempt.

If this were an ordinary suit between private litigants I might be content to rest upon the court's opinion. It is not such a suit. It is one which involves a business affected by the public interest and which is subject to stringent State regulation. The interest of the public cannot be safeguarded nor can the insurance business be properly regulated unless the public is kept well informed of the manner in which such business is operated and in which the laws pertaining thereto are enforced. Because of this and because I believe that the more than 1,600 claimants holding more than $1,200,000 in claims against Texas Mutual who will be disappointed by our decision should have explained to them how and by whom this gigantic fraud was perpetrated, this opinion is written.

Tracing all of the Ponzi-like financial manipulations of the Texas Mutual, describing all of the false, fictitious and fraudulent transactions conducted by it and detailing the evidence as to all such matters would consume an unwarranted amount of space. I will, therefore, only review the principal matters.

The Texas Mutual was conceived in fraud as is shown by the false affidavit of Paul and Leslie Lowry of Beaumont regarding the $20,000 which the company was required to have as its own in order to procure an authorization from the Insurance Board to do business. $10,000 of the $20,000 which the company had on deposit in the Beaumont Bank was borrowed from David E. O'Fiel, a Beaumont attorney, and was repaid to him within one week but of course after the bank had certified to the Board the amount on deposit. The balance of the $20,000 was converted by Paul Lowry within the same period of time.

The type of insurance policy which Texas Mutual was originally authorized to write was one which provided that under certain (and not too uncommon in my ex-

1. Art. 21.28, Insurance Code.

perience) circumstances the policyholder would be subject to an assessment equal to one premium or premium deposit.[2] This type of policy is much more difficult to sell than one which is nonassessable.

Texas Mutual, realizing this, sought to take advantage of the law [3] which provided that it could write nonassessable policies as long as it maintained a free surplus of $200,000.

The $200,000 requirement was met and conquered in this fashion:

Emmett E. Langham and David E. O'Fiel acquired certain improved property in Beaumont for about $60,000 in 1943 or 1944.

David Hubert O'Fiel of Beaumont is the son of David E. O'Fiel and is also an attorney. He and his father occupied adjoining offices and the son had access to his father's files and knew what this building had cost and that it earned a monthly rental of $950 per month in July and August of 1949.

Mr. O'Fiel Senior and Mr. Langham sold this building to Texas Mutual by deed dated August 5, 1949. Hubert O'Fiel, according to his father, represented Texas Mutual in this transaction. The recited consideration for this deed was $10 and other good and valuable considerations but the actual consideration was $100,000, all notes, no cash. Texas Mutual assumed a $40,000 debt and gave Langham and O'Fiel notes for the balance.

Under date of August 8, 1949, Paul Lowry as president and Leslie Lowry as secretary of Texas Mutual, executed and sent to the Insurance Board a certificate of advance which recited that Paul R. and Leslie D. Lowry had jointly advanced to Texas Mutual the sum of $336,000 "for the purpose of promoting or conserving its business, or to enable it to comply with any requirement of the law" and further reciting that such sum should be "repayable

out of the surplus remaining after providing for all reserves and other liabilities and shall not otherwise be a liability or claim against the Company or any of its assets."

Attached to this certificate was an appraisal of the building above mentioned. This appraisal was signed and acknowledged[4] by D. Hubert O'Fiel, Carl A. Kohler and A. B. Marshall before a Notary Public of Jefferson County. The "present market value" of the property was appraised at $436,000. The appraisal contained the following statement:

"The whole of this property is now under lease for five years at monthly rental of $2000.00 to another Insurance Company, who, in turn, subleases to the present occupants. There seems to be no question that the rental value will, if anything, increase in the future. The following appraisals are by capitalization at present income and replacement at present costs."

The factual statement in the above statement regarding the income and lease of this property to an insurance company were known to be false by D. Hubert O'Fiel when he signed such appraisal. It should be remembered that Hubert O'Fiel gave this value to the property only three days after his father had sold it for less than one-fourth of its appraised value.

The same day, August 18, 1949, on which the above certificate of advance and appraisal were filed with the Department of Insurance the following letter was sent to Paul Lowry, President of Texas Mutual:

"We have received the appraisals of the property in Beaumont, which you and your brother Mr. Leslie Lowry are deeding to the Texas Mutual Insurance Company as home office property, together with the Certificate of Advance taken therefor.

"Both the appraisal and the Certificate of Advance are acceptable to this

2. Art. 15.01 et seq., Insurance Code.
3. Id.

4. The law seems to contemplate a sworn appraisal. Arts. 2.10 and 8.05, Texas Insurance Code.

Department. We are enclosing duplicate copy of the Certificate of Advance with our file-stamp thereon."

The letter was signed for George B. Butler, Chairman, Board of Insurance Commissioners by L. W. Blanchard, Chief Examiner.

On November 7, 1949, Mr. Blanchard for Commissioner Butler again wrote Paul Lowry, President of Texas Mutual, in part as follows:

"The writer personally examined the deed in which you and your brother conveyed to the Texas Mutual Insurance Company real estate for home office property together with the appraisal made by Beaumont real estate men on this property, and this Department has accepted the home office property at a valuation of $436,000.00 less the outstanding incumbrance, originally at $100,000.00, as a fair and reasonable valuation on the property for your company."

As a matter of fact there was no deed to the Lowrys. The conveyance of the property was direct from Langham and O'Fiel to Texas Mutual.

Following approval of such appraisal and certificate of advance the Insurance Board authorized Texas Mutual to write non-assessable policies.

Just how this property which mushroomed in value so fast was valued and how approval of such value by the Insurance Board was obtained with such ease and dispatch brings into focus the part played by State Senator and Attorney William T. Moore of Bryan, Texas.

Senator Moore became acquainted with Paul Lowry between the years 1938 to 1942 and he became acquainted with Leslie Lowry after the last war. He represented Paul Lowry as an attorney regarding an estate matter not connected with the affairs of Texas Mutual. Senator Moore was on the payroll of the Atlantic Finance Corporation of which Paul Lowry was one time president. Senator Moore did not recall exactly when he was employed to represent Texas Mutual. There were "preliminary discussions" apparently with Paul and Leslie Lowry regarding the appraisal of the Beaumont property and during the first week in August 1949, Insurance Board Chairman, George B. Butler, testified that:

"About the early part of August, 1949, either August 2nd or 3rd, my father-in-law was buried in Texarkana. There were several people from Austin—several of his friends and my friends from over the State that attended that funeral. Among them was Senator W. T. Moore of Bryan. He approached me in the Grimm Hotel approximately that date, we will say the 3rd of August—it could have been the 4th, or 2nd of August, 1949— and he asked me if he could talk to me about a matter of the valuation of real estate in regard to this particular company, the Texas Mutual Insurance Company. I told him that I was in no condition to talk at that time about any business, and that I would appreciate it if he would take it up with the Chief Examiner and Chief Clerk of the Department,—I didn't say it in those exact words, but that is about what it amounted to—Mr. L. W. Blanchard, and he stated he did not know Mr. Blanchard. Mr. Blanchard was at the funeral, and Mr. Knox and Mr. Swartz of my Department, and other people. I introduced him to Mr. Blanchard and asked him to take care of the matter."

Commissioner Butler did not recall anything further in connection with the appraisal.

The appraisal was actually prepared by Paul Lowry. When questioned regarding his connection with this appraisal Senator Moore testified:

"A. I had no connection with making the appraisal, Mr. Allred. The law said two freeholders, and, as I recall, I couldn't be positive, I think we had three freeholders that made the

appraisal, whatever it was. I can't even recall.

"Q. Where did you get that appraisal? A. I can't recall whether it was delivered to me personally or mailed to me. I didn't see the building myself.

"Q. All right. Now, did you have any discussion with anyone concerning it before you received that appraisal? A. No, sir.

"Q. Did you ever receive more than one appraisal on that building of Texas Mutual? A. I don't recall.

"Q. Mr. Moore, when you did get this appraisal, what were you supposed to do with it? A. Well, naturally, I was supposed to present it to the Department, and get it approved.

"Q. All right. Now, did you present it to— A. I am sure I did. It was—but who I presented it to, I couldn't be positive at this date.

*    *    *    *    *    *

"Q. Mr. Moore, will you just tell me, please sir, what did you do when you got this appraisal, wherever you got it, or however you received it, what did you do with it? A. Well, naturally, Mr. Allred, I presented it to somebody in the Department, whether it was Mr. Blanchard or Mr. Butler or who. I am sure it was one of the two of those gentlemen. Knowing Mr. Butler as I do, I believe it was probably Mr. Blanchard, because I am sure Mr. Blanchard was there.

"Q. All right. Now, when you presented it, was it agreeable as presented to them? A. I don't recall, Mr. Allred.

"Q. You don't recall whether you had any discussion as to the sufficiency of it? A. I do not.

"Q. You have no recollection whatsoever of having any discussion with whoever it was you talked with concerning the sufficiency of that appraisal? A. No, sir, it was four years ago, Mr. Allred. Can you remember what you did four years ago?

"Q. Pretty well."

The record in this case shows that the appraisal which the Insurance Department approved was mailed by Paul Lowry in Beaumont direct to Mr. L. W. Blanchard, Chief Examiner.

While Senator Moore did not recall seeing but one appraisal and Mr. Blanchard testified that he did not receive nor see but one appraisal of this property there were actually two appraisals. The other appraisal, the original of which is in the record, was acknowledged by Hubert O'Fiel, Carl A. Kohler and Sampson Carr on July 27, 1949. This appraisal fixed the value of the Beaumont property at $561,000. There are some pencil notes on this appraisal in the handwriting of Mr. W. W. Heath, an attorney of Austin, Texas. One of the notations reads "Show if member of Beaumont real estate Board." Also penciled thereon is the division of 872,000 by 2 leaving the quotient as "436,000." Regarding this appraisal Mr. Heath testified that he recalled Senator Moore visiting him socially at home in mid-1949 and that he had some papers with him.

Regarding this visit Mr. Heath testified:

"* * * he asked me if I knew the Lowrys, and I told him about the same thing I told you, that I had met the one that was in the Legislature when he was here, and if I knew the other one, it didn't make enough impression on me that I recalled it. He told me that he had been employed by them either as their Texas Counsel or General Counsel, or I don't recall just what capacity, and that some insurance company, I think the name of it is what you said—

"Q. Texas Mutual? A. I am not even sure that that is the name of it, but if that is the one—I know it is the one that is having—I have read about

in the papers. I assume that is the name of it, and said that they owned a piece of property. I don't know whether he said the Lowrys owned it or one of them or just what the ownership was. Again, it didn't make that much impression on me, that they wanted to make it the Home Office Building for this insurance company, and that they wanted to put it into the assets of the Company for that purpose. I don't know whether he said they wanted to or that they already had. Anyway, the conversation was about putting the building into the assets, and he asked me in connection with establishing an evaluation on it if I was familiar with the legal requirements. I told him that I was, and we discussed the statute applicable to such transactions, one of which, as I recall it, provides that it has—that the value has to be established by appraisal of two free holders familiar with the value. He asked me if I knew what the requirements of the Department was with regard—their rules and regulations with respect to that statute. I told him that I didn't, that I didn't know whether they had any formal rules, that I doubted that they did, but that my understanding of the matter was that usually that two competent real estate men familiar with values in that locality were selected, and that they prepared their appraisal in a form that a real estate man would understand, that I didn't understand, because I am not in the real estate business, but that I was sure that any competent real estate man would know what was necessary to be done, and we had a discussion along that line, and finally it veered off into other matters. I want to say in that connection my discussion was purely incidental. I don't represent this insurance company. I have never represented them. I don't represent the Lowrys or any business that they have the slightest connection with, neither of the Lowrys or any of their business has ever paid me any kind of

a fee directly or indirectly, themselves or through any splitting any fee, whatever fee Senator Moore got, he didn't give me any part of it. It was purely a social discussion, one in which I had absolutely no interest except that Senator Moore was and has been for many years a friend, and I discussed it along such lines as I would have with any other lawyer friend of mine under the same circumstances."

The record shows that on August 31, 1949, Paul Lowry for Texas Mutual sent Senator Moore the following letter:

"Dear Mr. Moore:

"The Board of Directors has authorized me to state definitely the obligation of the Texas Mutual Insurance Company to you.

"For legal services rendered and to be rendered, the Texas Mutual Insurance Company agrees to pay you the sum of Ten Thousand Dollars ($10,000.00) of which sum the amount of Fifteen Hundred Dollars ($1500.00) has already been paid unto you, leaving a balance of Eighty Five Hundred Dollars ($8500.00). It is further agreed that payments will be made at the rate of Three Hundred Dollars ($300.00) per month and to be paid by the Texas Mutual Insurance Company on and by the first day of each month. The first of such monthly payments to be made on the first day of October, 1949, and a like installment upon the first day of each month until the sum of Eighty Five Hundred Dollars ($8500.00) has been received by you, which together with the Fifteen Hundred Dollars ($1500.00) already paid will make the total sum of Ten Thousand Dollars ($10,000.00).

"It is further agreed by the Texas Mutual Insurance Company and it is herewith covenanted that in the event of your death, such payments will continue to your estate or unto such party or person as you shall by will direct, until such time as complete payment of the principal sum has been effected.

"It is agreed by both parties that this obligation is interest-free and is not assignable.

"We trust that this outlines completely the obligation of ourself to you. We take this opportunity to express our appreciation for your splendid services in the past."

Under this agreement Senator Moore received $9,500. The record also shows that between December 4, 1949, and February 7, 1953, Senator Moore received from Texas Mutual an additional $4,100.

When questioned regarding these payments and what they were for Senator Moore testified:

"Q. Mr. Moore, after you started receiving $300 per month from Texas Mutual, did you receive other sums other than your $300 per month from them? A. I can't recall, Mr. Allred. It is possible that I did for travelling expenses. I just don't know.

"Q. Now, for that $300 per month, what were you supposed to do, Mr. Moore? A. Well, Mr. Allred, now, I was the attorney, and I was to do whatever they called on me to do.

"Q. Well, now, can you tell me anything, any matters at all that they ever told you to do for them? A. I was called on frequently. As to what we did or as to what I told them, I don't know, but I was called on the 'phone, and I have met Paul over here, and, in fact, I made a trip with him to Chicago once. I don't recall the details of what we did or—

"Q. All right. I will ask you did you ever receive from Texas Mutual any money other than for legal fees? A. No, sir.

"Q. Mr. Moore, did you not, in addition to the $300 per month that you received from Texas Mutual as a part of your $10,000, did you not on numerous occasions receive a check for $100 for services performed by you for Texas Mutual? A. Yes, sir, but

I can't recall how many times or what it was for.

"Q. Well, when you did perform some service for Texas Mutual other than— A. That was more or less in the form of travelling expenses, Mr. Allred. It wasn't a fee, reimburse me for actual travelling expenses, any check like that.

"Q. All right. Now, did you in the latter part of 1952 and early part of 1953 begin to receive some checks from Texas Mutual— A. Yes, sir.

"Q. —for $600? A. Yes, sir.

"Q. Per month? A. Yes, sir.

"Q. Mr. Moore, can you tell me of a single thing that you did for Texas Mutual Insurance Company from 1949 up to the present time? A. Well, Mr. Allred, I am going to—

"Q. Just a moment, please, sir. Other than presenting that appraisal and the work that you did, you said, in January and February of this year? A. Mr. Allred, I am going to refuse to answer that question, unless I am forced to. I don't believe they will force me to, but I did perform numerous services for the Texas Mutual as an attorney for the Texas Mutual.

"Q. Now, you are going to refuse on what ground? A. On the grounds it is privileged between client and attorney. You may be representing the Texas Mutual now, but you were not representing the Texas Mutual at that time.

"Q. And you refuse to— A. Unless I am ordered to do so.

\*   \*   \*   \*   \*   \*

"Q. \* \* \* but I want to ask you to state, please, sir, if you will, what services, if any, you performed for Texas Mutual Insurance Company except the appraisal prior to 1953? A. Well, Mr. Allred, as I said before, I represented the Lowry Brothers. I represented Texas Mutual Insurance Company. I would assume

that I was on—I mean, my primary function was representing Texas Mutual, and, as I said before, I performed many services for them, which is in the nature of a confidential capacity, being as their attorney, and I am going to just refuse to go into that.[5]

\* \* \* \* \* \*

"Q. I am not asking you for every 'phone call or anything of that sort, Mr. Moore. I am asking you to tell me anything that you did for them, for Texas Mutual Insurance Company, except the appraisal prior to 1953? A. Well, I made numerous trips to the Department for them. I made a trip to Chicago for them.[6]

"Q. What did you go to Chicago for? A. In an effort to secure some reinsurance contracts.

"Q. Well, who did you see in Chicago? A. I forget the name of this firm. Mr. Lowry can possibly tell you. We talked to some firm up there that specializes in reinsurance.

"Q. What did you go to the Insurance Department here in Texas for after the appraisal matter? A. Well, Mr. Allred, any insurance company has various problems that come up, that is, disputes with agents over some claim—

"Q. Do you recall anything that you went up to the Department— A. I couldn't recall anything specifically, but I can say this, that I considered I was well—earning what they were paying me. I will answer the question by that. In fact, I asked them many times to raise me."

Having obtained authority to write non-assessable policies Texas Mutual faced the problem of continuing this authority in effect. Since Texas Mutual never at any time had the $200,000 free surplus required by law for this privilege it resorted again to fraud and corruption in order to retain the authority to write this type of policy. The fraud consisted of fake financial reports sworn to by Paul and Leslie Lowry and by rigged and spurious financial transactions which only a warped financial wizard could conjure up or understand.

Needless to say they were all crooked. The details are in the record but no good would be done by reciting them here.

False financial statements did not fully protect Texas Mutual—there was the spectre of an audit by examiners of the Insurance Department. This, however, proved to be no problem for Texas Mutual. Shortly before the regular biannual audit was due, according to Stanley W. Izard, an insurance accountant and statistician at the time employed by Texas Mutual, who testified regarding this matter as follows:

"Q. \* \* \* Do you recall V. C. Thompson making an examination of Texas Mutual Insurance Company? A. Yes.

"Q. Before he came there to make that examination, did you know that V. C. Thompson was coming to make the examination? A. Not until about two days before.

"Q. Prior to the time you learned that, had you had any discussion with either one of the Lowrys concerning an examination of Texas Mutual Insurance Company? A. Yes, several conversations.

"Q. Will you tell me the first conversation that you recall, and who you

---

5. This objection was untenable for the reason that the client and not the attorney may claim the privilege and in this instance the client, Texas Mutual, through its attorney, waived the privilege. It is also the law that the privilege cannot be invoked when advice is sought for the purpose of guiding or assisting a client in the commission of a crime or the perpetration of a fraud. McCormick and Ray, Texas Law of Evidence, Secs. 229 and 224.

6. It is interesting to note that the $300 monthly payment due Senator Moore for October 1950 was satisfied by check 01906 for $200 bearing this notation: "Legal expense $300.00 less Share to Chi. $100.-00."

had it with, concerning an examination or a proposed examination of Texas Mutual? A. I called the attention of both Paul and Leslie Lowry to the fact that our company was due for an examination under the law, and that was on our—that would be on our 1951 (1950) Annual Statement.

\*   \*   \*   \*   \*   \*

"A. And the law permitted, rather required the Board to examine companies every two years. Well, our company finished its second year, not full year, but what would be called its second operating year, in 1950, and so both the Lowrys expressed a desire that the Texas Insurance Department make such an examination for the purpose of forestalling a convention examination, in which at least three states must be represented.

"Q. Now, prior to the time they made that statement, did either one of the Lowrys make any inquiry of you as to the type of examination that would be made ordinarily? A. Yes, to this extent. I was given definitely to understand that the Examiner would not be too critical of anything he might find.

"Q. How were you given that to understand? In what way? A. By statements of both Paul and Leslie to the effect that—

"Q. What did they say to you, as best you recall? A. This was the conversation we had. I asked one of them, I think it was Paul, I said, 'What do you think the Examiners will do about writing down our buildings?' And he says, 'Don't have any worries about that. Nothing. He won't do anything,' I said, 'Well, are you sure?' And he said, 'Of course, I am sure.' That was my principal worry, and I knew in a convention examination that property would have been written down, because those Examiners would make their own appraisal.[7]

"Q. Now, let me ask you, who mentioned the word 'convention examination' first, you or the Lowrys, as you recall? A. I think I did, because I wanted to impress them with the seriousness of the situation, if we had a convention examination, and I think it was the result of that, I am sure it was, of that conversation that caused them to arrange for Mr. Thompson to come in.

"Q. Did they, either one of them, ask you what a convention examination was, as you recall? A. I think I explained it to them without their asking about it. You see, my purpose was to get them to, make them know that such a thing was possible, and that the results could be serious. I was definitely worried."

7. Regarding this requested audit Paul Lowry testified:

"Q. Do you recall an examination made in the Spring of 1951 by one of the Examiners for the Insurance Department as of December 31, 1950? A. Yes, sir, I recall the examination.

"Q. Did you arrange for that examination to be made? A. We asked for an examination. I wouldn't say that we arranged.

"Q. Who did you ask for that examination? A. We called the Department, somebody in the Department. I don't remember whether it was Mr. Butler or Mr. Blanchard or the other Mr. Butler, and asked them if we could have an examination of the Company.

"Q. Why were you asking for an examination, Mr. Lowry? A. Because we were entering some other states or anticipated entering other states who required an examination.

"Q. You had already entered some other states when that was done, had you not? A. Well, when was the examination made?

"Q. As of December 31, 1950. A. Yes, I think we had entered Louisiana by that time.

"Q. Had you entered in Alabama by that time? A. I don't recall the date of entrance into Alabama.

"Q. Did you not have in mind in securing the examination by one of the Examiners here in Texas that you wanted to prevent a convention examination being made? A. I don't believe that that had any consequence of it."

The record shows that on February 13, 1951, Robert R. Butler, Supervising Examiner for the Insurance Board, wrote V. C. Thompson, an examiner for the Board, directing him to go to Beaumont and examine Texas Mutual. Mr. Thompson did go to Beaumont and examined Texas Mutual and, according to Mr. Izard:

"Q. Mr. Izard, after Mr. Thompson, V. C. Thompson, came down there examining this Company, do you know of your own knowledge whether he was paid any money during the course of that examination? A. Yes, I do. He was.

"Q. How do you know that? A. There were three occasions when I delivered it to him personally. It was in currency in an envelope.

"Q. Where did you get the currency? A. I got it from Paul Lowry.

"Q. How much did you deliver to him each time? A. In each of these three cases it was $100.00.

"Q. How did you happen to deliver that money to him? What caused you to do it. A. I was told to by Mr. Paul Lowry.

"Q. What did Mr. Lowry say to you with reference to it? A. He said that Thompson was hard up and needed money, and that he felt it was good politics on the part of him, Paul, to help him out at this particular time and that, in other words, he would probably do his job a little more cheerfully and agreeably."

The record also shows that while Mr. Thompson was in Beaumont on this occasion he borrowed money from the Atlantic Finance Corporation of which Paul Lowry was President which had not been repaid.

The record also shows that Texas Mutual paid $43.09 Adolphus, Dallas, hotel bill for Mr. Thompson around New Year 1951.

The sworn report made by Mr. Thompson of his examination was very favorable to Texas Mutual. The following is taken from such report:

"On July 15, 1949, the Company acquired a building located in the 1000 block of Pearl Street in the City of Beaumont, Jefferson County, Texas, as its future home office.

"The property was originally purchased at a cost of $436,000.00 [8] with an encumbrance of $97,467.25, making the book value $338,532.75 at December 31, 1949. During 1950 the encumbrance was reduced by $7,457.40.

"The building is a one story structure composed of hollow tile, brick, stucco and steel frame throughout. The usable space in the building is approximately 32,400 square feet and covers approximately one-third of a city block in downtown Beaumont, Texas.

"At the present time the Company does not occupy the building as it was under lease to automobile dealers at the time it was acquired. One lease expires on November 1, 1952, while the other expires January 1, 1955. The Company receives a monthly rental from the building in the amount of $900.00. Income received during 1950, amounting to $10,800.00, was satisfactorily verified during the course of this examination.

\* \* \* \* \* \*

"The business of the Company appeared to be well managed and conducted on a conservative basis. General and subsidiary records were well maintained and reflected satisfactory progress made by the Company since its organization.

"The courtesy and cooperation extended by officers and employees of the

---

8. In connection with this false statement attention is directed to Art. 1.18 of the Insurance Code providing for a bond and oath for examiners and defining their liability.

Company during the course of this examination is acknowledged."

This record reveals that attorney David Hubert O'Fiel refused to answer questions concerning the incorporation of the Texas Fire Insurance Company on the ground "that it might be self incriminating, Sir."

The record shows also that Paul Lowry on more than fifteen occasions refused to answer on the ground of self-incrimination.

The responsibility is with other branches of our State government and with the agencies of the State Bar to see that our laws and the ethics of the legal profession are not violated with impunity.[9]

---

9. Nothing in this opinion should be construed as imputing bad faith to appellee or his attorneys in this proceeding. Acknowledgment is made to them as well as to other counsel for developing the facts set out herein and without which the sorry spectacle presented would have been unpresented and generally unknown.